UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
SANDRA S. BOARDMAN,                          :

       Plaintiff,                              :

       v.                                      :        **9:10-cv-02222-SB**

FRED CLARK, HEATHER SLAMENICK            :
HARMON and CLARK & CLARK OF
SAVANNAH, LLC,                               :

       Defendants.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


WILLIAM M. BOWEN, P.A.
William M. Bowen
Federal Bar No.: 1405
PO Drawer 6128
Hilton Head Island, SC 29938

*Attorney for Plaintiff*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ ii, iii

PRELIMINARY STATEMENT ................................................................................ 1

FACTS IN DISPUTE ................................................................................................ 2

ARGUMENT:

SUMMARY JUDGMENT STANDARD ................................................................... 3

I.   AMPLE EVIDENCE SUPPORTS EACH OF THE ELEMENTS
     OF PLAINTIFF'S LEGAL MALPRACTICE CAUSE OF ACTION ...................... 4

     A.  Defendants Admit That Questions of Fact Exist
         As to Whether They Breached the Standard of Care ................................. 5

         1.    The Standard of Care ................................................................... 5

     B.  Defendants' Malpractice Caused Damages to Plaintiff ........................... 7

         1.    Legal Cause ................................................................................. 8

         2.    The Record Is Replete with Evidence of
               Defendants' Breaches of the Standard of Care ........................... 8

               (i).     Negligent preparation ...................................................... 9

               (ii).    Negligence in the mediation............................................ 21

               (iii).   Negligent hearing presentation........................................ 21

               (iv).    Negligent failure to oppose the motion to dismiss ........... 24

     C.  Cause in Fact ........................................................................................ 28

II.  JUDGMENTAL IMMUNITY IS NOT AVAILABLE
     FOR AN ATTORNEY'S NEGLIGENT JUDGMENTS ......................................... 33

CONCLUSION ..................................................................................................... 34

# TABLE OF AUTHORITIES

Page

Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505 (1986) ............................... 3, 4

*Baughman v. American Telephone and Telegraph Company,* 306 S.C. 101,
  410 S.E.2d 537 (1991) ........................................................................................ 28

*Brown v. Theos,* 345 S.C. 626, 550 S.E.2d 304 (2001)........................................................ 8

*Celotext Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986)............................... 3, 4

*Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir. 1979) .......................................... 4

*Cianbro Corp. v. Jeffcoat & Martin,* 804 F.Supp. 784 (D.S.C. 1992).................................. 33

*Coronet v. Johnson,* 571 N.E.2d 572 (Ind. App. 1991) ........................................................ 7

*Ellis v. Davidson,* 358 S.C. 509, 595 S.E.2d 817 (Ct. App. 2004)........................................ 5

*Georgou v. Fritzshall,* 1995 WL 248002 (N.D. Ill. April 26, 1995) ...................................... 7

*Helmbrecht v. St. Paul Ins. Co.,* 122 Wis.2d 94, 362 N.W.2d 118 (1985) ........................... 8

*Hirschberger v. Silverman,* 80 Ohio App.3d 532, 609 N.E.2d 1301 (1992) ....................... 7

*In re Apex Corp.,* 190 F.3d 624 (4th Cir. 1999) ...................................................................... 3

*In re Elwood Dean French,* 499 F.3d 345 (4th Cir. 2007)...................................................... 3, 4, 9, 27

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation, et al.,*
  475 U.S. 574, 106 S.Ct. 1348 (1986) .................................................................... 3

*Moore v. Weinberg,* 373 S.C. 209, 644 S.E.2d 740 (Ct. App. 2008) .................................. 5, 6

*Norris v. Alexander,* 246 S.C. 14, 142 S.E.2d 214 (1965) ................................................... 6, 27

*Phillips v. Clancy,* 152 Ariz. 415, 733 P.2d 300 (1986) ..................................................... 7

*Pierce v. Ford Motor Co.,* 190 F. 2d 910 (4th Cir.) .............................................................. 3

*Pulliam Investment Co., Inc. v. Cameo Properties, et al.,* 810 F.2d 1282
  (4th Cir. 1987) ..................................................................................................... 4, 34

*Ross v. Communications Satellite Corporation,* 759 F.2d 355 (4th Cir 1985) .................... 3, 4

*Rubens v. Mason,* 387 F.3d 183 (2nd Cir. 2004) .................................................... 7

*Sims v. Hall,* 357 S.C. 288, 592 S.E.2d 315 (Ct. App. 2003) ............................... 8, 27

*Small v. Pioneer Machinery, Inc.,* 329 S.C. 448, 494 S.E.2d 835
(Ct. App. 1998) ........................................................................................... 5, 8, 27

*Smith v. Haynsworth, Marion, McKay & Geurard,* 322 S.C. 433,
472 S.E.2d 612 (1996) ......................................................................................... 6

*Trivelas v. South Carolina Dep't of Transportation,* 348 S.C. 125,
558 S.E.2d 271 (Ct. App. 2001) ........................................................................... 5

*Turner v. Milliman,* 392 S.C. 116, 708 S.E.2d 766 (2011) ................................. 3n, 9

<u>Statutes and Rules</u>

Federal Rules and Civil Procedure Rule 56 ............................................................ 3

South Carolina Appellate Conduct Rules – Rule 407 ......................................... 6, 25

FINRA Code of Arbitration Procedure Rule 12303(a) ......................................... 15

FINRA Code of Arbitration Procedure Rule 12403 ............................................. 12n

FINRA Code of Arbitration Procedure Rule 12404 ............................................. 12n

FINRA Code of Arbitration Procedure Rule 12503 ............................................. 27n

FINRA Code of Arbitration Procedure Rule 12504 ............................................. 27n

FINRA Code of Arbitration Procedure Rule 12506 ....................................... 14n, 17

FINRA Code of Arbitration Procedure Rule 12507 ............................................. 14

FINRA Code of Arbitration Procedure Rule 12514(b) ......................................... 20

FINRA Code of Arbitration Procedure Rule 12608 ............................................. 27n

<u>Treatises</u>

Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice Vol. 2 27.23 (1984) ................. 7

W. Page Keeton, et al., Prosser and Keeton on Torts § 41 (5th ed. 1984) ............................ 7

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SANDRA S. BOARDMAN,                          :

        Plaintiff,                          :

        v.                          :        **9:10-cv-02222-SB**

FRED CLARK, HEATHER SLAMENICK             :
HARMON and CLARK & CLARK OF
SAVANNAH, LLC,                          :

        Defendants.                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Sandra S. Boardman ("Plaintiff") respectfully submits this memorandum in opposition to the Defendants' Motion for Summary Judgment (the "Motion") seeking summary judgment on all aspects of Plaintiff's legal malpractice claim pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

### PRELIMINARY STATEMENT

Defendants Motion, which admits there are genuine issues for trial concerning the claimed breach of the standard of care, seeks summary judgment as to the proximate cause elements of Plaintiff's case, but mischaracterizes the record and omits discussion of the evidence that: (i) the persistent breaches of the standard of care by Defendants in every aspect of their representation were the proximate cause of Plaintiff's damages; and (ii) that the record contains strong evidence of Plaintiff's damages in the form of the evidence that was available to them during the underlying arbitration. Moreover, only by ignoring the fact that summary judgment is not appropriate on the breach issue can Defendants justify renewing the discredited claim that Defendants are protected from liability for the persistent breaches of the standard of care in every aspect of their

representation because of the so-called doctrine of "judgmental immunity," which applies only when negligence is not involved. As shown below, each of Defendants' assertions is inaccurate, mistaken or just plain inapplicable and disputed issues of genuine and material fact abound requiring trial; therefore, summary judgment should be denied.

## FACTS IN DISPUTE

In 2001, Mrs. Boardman owned 150,000 shares of a bank stock that she had inherited from her parents valued at around $4.1 million, representing approximately 90% of her total invested value and around 90% of her net worth. In 2001 Mrs. Boardman was 65 years old and an unsophisticated investor with little more than a high school education when she opened the account at what is now UBS that led to the claims in the underlying arbitration in which Defendants are alleged to have committed malpractice. The record details shows Defendants deviated from the standard of care at each stage: pleading, arbitrator selection, discovery, presentation of evidence, and opposing the respondents' motion dismiss at the close of the claimant's evidence.

The material facts in dispute concern all aspects of Plaintiff's cause of action for negligence. Defendants admit that there are questions of fact relating to whether Defendants breached the standard of care in their representation of Mrs. Boardman in the arbitration proceeding, they contend that no questions of fact exist as to damage and proximate cause. Plaintiff contends that material facts are in dispute as to whether (a) Defendants' breaches caused the adverse outcome in the arbitration; (b) the arbitration loss caused her damage; and (c) such damages were proximately caused by Defendants' conduct. Plaintiff contends that there is a comprehensive record supporting each element of the claim. Basic facts regarding the arbitration proceedings are set out in the Motion. The specific facts relied upon by Plaintiff in opposition to the Motion, concerning Defendants' mishandling of the entire arbitration process and proximately causing her damage, are set out in the body of the following argument. The cited portions of the record are submitted with

the accompanying affirmation of Thomas M. Campbell dated September 26, 2011 ("Campbell Affirmation").

# A R G U M E N T

## Summary Judgment Standard

An award of summary judgment pursuant to Fed. R. Civ. P. 56(a)[1], is proper "only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *In re Elwood Dean French*, 499 F.3d 345, 352 (4th Cir. 2007); *citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247, 106 S. Ct. 2505, 2510 (1986); and *In re Apex Corp*., 190 F.3d 624, 633 (4th Cir. 1999).[2]  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion" (*Celotext Corporation v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548 (1986)); and "[o]nly where it is 'perfectly clear that there are no issues in the case' is summary judgment proper." *Ross v. Communications Satellite Corporation*, 759 F.25 355, 364 (4th Cir. 1985), *quoting Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir.), *cert denied*, 342 U.S. 887, 72 S.Ct. 178 (1951).

When the moving party has carried its burden under Rule 56, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corporation, et al*., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986).  However, to avoid summary judgment, all that is required of the non-moving party is that sufficient evidence be shown supporting the claimed material factual dispute requiring a trial.

---

[1]    Rule 56 has been amended and reorganized numerous times recently, in 2007, 2009 and 2010.  However, as noted in the Advisory Committee Note to the 2007 Amendment, the "changes are intended to be stylistic only"; and, again in the note to the 2010 amendment: "the standard for granting summary judgment remains unchanged."  Fed R. Civ. P. 56 advisory committee notes (West 2011).

[2]    The South Carolina Supreme Court expresses the same standard: the moving party is required to show that it "must prevail as a matter of law."  *Turner v. Milliman*, 392 S.C. 116, 122, 708 S.E.2d 766, 769 (2011).

*Anderson*, 477 U.S. at 249, 106 S. Ct. at 2510, citations omitted.  In the words of the Fourth Circuit:

"[s]ummary judgment is proper only when it is clear there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts."  *Pulliam Investment Co., Inc. v. Cameo Properties, et al*., 810 F.2d 1282, 1286 (4th Cir. 1987) (citations omitted).[3]  In reviewing the facts and drawing inferences from the record, the non-moving party is:

> [E]ntitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf, and finally, to be given the benefit of all favorable legal theories invoked by the evidence as considered.

*Ross*, 759 F.25 at 364, *quoting Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).  Of course, all reasonable inferences from the facts must be drawn in the light most favorable to the non-moving party, without weighing the evidence or making credibility determinations.  *In re Elwood Dean French*, 499 F.3d at 352, citations omitted.  If the moving papers do not "demonstrate the absence of any genuine issue of material fact, summary judgment is not proper and must be denied."  *Id*., *citing Celotext Corp*., 477 U.S. at 323, 106 S.Ct. at 2548.

## I.

### AMPLE EVIDENCE SUPPORTS EACH OF THE ELEMENTS OF PLAINTIFF'S LEGAL MALPRACTICE CAUSE OF ACTION

As shown below, there is ample evidence in the discovery produced in this action to support each of the four elements of Plaintiff's malpractice claim: (1) the existence of an attorney-client relationship; (2) breaches of the standard of care owed by the attorney; (3) damage to Plaintiff; and (4) proximate cause, that is, Plaintiff's damage resulted from the breaches of the standard of care. *Ellis v. Davidson*, 358 S.C. 509, 523, 595 S.E.2d 817, 824 (Ct. App. 2004).  While the issue of

---

[3]    The long-standing South Carolina standard is expressed more strongly as "the non-moving party is only required to submit a mere scintilla of evidence."  *Turner*, 392 S.C. at 122, 708 S.E.2d at 769.

4

negligence is a mixed question of law and fact (*Moore v. Weinberg*, 373 S.C. 209, 221, 644 S.E.2d 740, 746 (Ct. App. 2008) (citations omitted)), once the duty is found to exist (or, as here, admitted because of the attorney-client relationship), "the jury then determines whether a breach of the duty that resulted in damages occurred." *Id.* Proximate cause has two elements (legal cause and cause in fact) and requires that there be expert testimony as to both. Finally, proximate cause is a question of fact for the jury. *Trivelas v. South Carolina Dep't of Transportation*, 348 S.C. 125, 135, 558 S.E.2d 271, 276 (Ct. App. 2001); *Small v. Pioneer Machinery, Inc.*, 329 S.C. 448, 463, 494 S.E.2d 835, 842 (Ct. App. 1998).

**A. Defendants Admit That Questions of Fact Exist**
   <u>**As to Whether They Breached the Standard of Care**</u>

Defendants have admitted there are questions of fact precluding summary judgment as to the existence of the duty and its breach because both sides have produced expert evidence who offer contradictory opinions on the breach issue. However, the nature and scope of the evidence of Defendants' deviations from the standard of care in this case were so pervasive and so cumulatively damaging to Plaintiff's possibility of success in the underlying arbitration, that it is nevertheless necessary to set forth the standard of care and discuss some choice examples of the evidence of breach as a predicate to showing that the arbitration result would have been different but for Defendants' malpractice.

    1. <u>**The Standard of Care**</u>

Under South Carolina law an attorney who contracts to prosecute an action on behalf of his client impliedly represents that (i) he possesses the requisite degree of learning, skill and ability which is necessary to the practice of his profession, (ii) he will exercise diligence in the prosecution of the litigation, and (iii) he will exercise reasonable skill in the application of his knowledge and

skill on behalf of his client.  *Norris v. Alexander*, 246 S.C. 14, 18, 142 S.E.2d 214, 217 (1965).  This

standard is incorporated into the South Carolina professional conduct rules which provide that:

> A lawyer shall provide competent representation to a client.  Competent
> representation requires the legal knowledge, skill, thoroughness and preparation
> reasonably necessary for the representation.

Rule 407 of the South Carolina Appellate Conduct Rules ("SCACR").  The South Carolina

Supreme Court has specifically acknowledged the relevance and admissibility of the Rules of

Professional Conduct in assessing the standard of care of an attorney in malpractice cases.  *Smith v.*

*Haynsworth, Marion, McKay & Geurard*, 322 S.C. 433, 437, 472 S.E.2d 612, 614 (1996).  As such,

the standard of care described in the Rules of Professional Conduct is relevant and admissible as a

factor in determining whether the attorney acted with reasonable care.  *Id.* at 437, 472 S.E.2d at

614; *see also Moore v. Weinberg*, 373 S.C. at 223, 644 S.E.2d at 747.

David Robbins is Plaintiff's expert on the standard of care and causation.  In addition to his

detailed and fully supported opinion that Defendants committed malpractice in every aspect of the

arbitration proceeding, Mr. Robbins asserts as his opinion that Defendants "never should have taken

this case, which at its core was a case of merit that could have been won and most certainly would

have settled in mediation had competent counsel been representing Mrs. Boardman."  Robbins

Report at p. 2.  Moreover, because of the complete absence of knowledge, skill and experience in

the field displayed by her lawyers, he concludes that:  "Defendants' lack of competence in the

specialized practice of securities arbitration was most probably the cause of plaintiff's case not

resolving in mediation and the arbitrators' decision to grant the [arbitration respondents'] motion to

dismiss" at the close of Ms Boardman's case-in-chief."  *Id.*  In conclusion, Mr. Robbins gives his

opinion that:  "As a result of defendants' deviations from the applicable standard of care . . .

plaintiff Sandra S. Boardman sustained financial losses including, without limitation, the damages

she sought and did not receive in the FINRA arbitration."  *Id.* at p. 31.  Mr. Robbins' 25 pages of

detailed identification of deviations from the standard of care evidencing Defendants' incompetence to represent Mrs. Boardman in the FINRA arbitration fully explain why her damages were proximately caused by the deviations.

## B. Defendants' Malpractice Caused Damage to Plaintiff

In a negligence action, the question of causation is the objective "reasonable person" standard. W. Page Keeton, et al., *Prosser and Keeton on Torts*, § 41 (5th ed. 1984). In short, whether an attorney met a reasonable standard of professional competence is an objective inquiry. Under this objective standard, the damages inquiry is not to determine what the result would have been had the claimed malpractice not occurred, but to determine what the result should have been. *See* Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* Vol. 2 § 27.23 (1984). The objective standard has long been accepted by the courts. *See, e.g., Rubens v. Mason*, 387 F.3d 183, 189 (2nd Cir. 2004) (question to be resolved is "whether a reasonable fact finder in the underlying suit would have arrived at a different result but for the lawyer's malpractice") (applying New York law, citations omitted); *Georgou v. Fritzshall*, 1995 WL 248002 (N.D. Ill. April 26, 1995) ([A] malpractice plaintiff is not required to demonstrate what award the original [fact finder] would have made if no malpractice had occurred. . . the fact finder must determine what a reasonable [fact finder] would have concluded and compare that conclusion to eh actual resolution of the underlying action to determine the damages.") (applying Illinois law, citations omitted); *Hirschberger v. Silverman*, 80 Ohio App.3d 532, 540, 609 N.E.2d 1301, 1306 (1992) (declining to impose a subjective standard in the proof of whether damages resulted from alleged legal malpractice) (applying Ohio law); *Coronet v. Johnson*, 571 N.E.2d 572, 575 (Ind. App. 1991) ("[T]he better rule is to analyze proximate cause with the objective standard of what a reasonable judge would have done.") (Indiana law); *Phillips v Clancy*, 152 Ariz. 415,417, 733 P.2d 300, 304 (1986) ("In legal malpractice cases, the impact of the lawyer's negligence in the underlying action is judged against

an objective standard rather than a subjective one.") (Arizona law, citations omitted); *Helmbrecht v. St. Paul Ins. Co.*, 122 Wis.2d 94, 105, 362 N.W.2d 118, 125 (1985) ("The jury did not have to decide what the [fact finder] in this case would have done; it had to decide what a reasonable [fact finder] would have done had [the lawyer] made a proper presentation of [plaintiff's] case . . . Malpractice is negligence, and negligence is determined objectively.") (Wisconsin law, citations omitted).

1. **Legal Cause**

Legal cause has three elements: (i) was there a duty; (ii) was it breached; and, (iii) if breached, would the result have been different "but for" that breach, *i.e.*, was the breach the proximate cause of the damage claimed by the plaintiff--the damage would not have occurred but for the defendant's negligence, and she "most probably would have been successful' in the action if the attorneys had not committed malpractice." *Brown v. Theos*, 345 S.C. 626, 629, 550 S.E.2d 304, 306 (2001) (citations omitted); *Sims v. Hall*, 357 S.C. 288, 298, 592 S.E.2d 315, 320 (Ct. App. 2003); *Small*, 329 S.C. at 464, 494 S.E.2d at 843. Legal cause requires evidence of foreseeability. *Sims*, 357 S.C. at 298, 592 S.E.2d at 320; *Small*, 329 S.C. 448 at 463, 494 S.E.2d at 842. Foreseeability is determined by looking to the "natural and probable consequences" of the act of malpractice. *Id.*

2. **The Record Is Replete with Evidence of Defendants' Breaches of the Standard of Care**

Drawing all reasonable inferences from the facts in the light most favorable to Plaintiff, in light of the litany of gross deviations from the standard of care evidenced by Defendants' actions during their representation of Mrs. Boardman, it defies common sense to argue that Plaintiff's expert's report does not explain how the Defendants' failures proximately caused her damages (Motion at p. 6), or to describe its conclusion as nothing more than "a blanket statement" that "does

8

not identify any proximate cause." *Id.*, emphasis omitted. Defendants' moving papers, carefully evading the full content and import of the record, including specifically Mr. Robbins' report, simply do not demonstrate unequivocally that there is no genuine issue of material fact for the jury as to Defendants' breaches proximately causing damage to Plaintiff. *In re Elwood Dean French, supra,* 499 F.3d at 352; *Turner v. Milliman*, 392 S.C. 116, 708 S.E.2d 766.

The record relied upon by Mr. Robbins discloses myriad ways in which Defendants breached the standard of care, such that Plaintiff's loss and consequent damages in the arbitration were foreseeable and the natural and probable consequences of the overwhelming malpractice. The following are examples of the many deviations that are evident from the record, the cumulative effect of which caused Plaintiff's damages.

**(i).** **<u>Negligent preparation</u>**. Defendants admitted that they were novices to FINRA arbitrations, never having participated in one or represented a client in one before the Boardman arbitration. (Defendants' Answers to Plaintiff's First Set of Interrogatories[4] at p. 1) Defendant Clark also admitted that he did not read or learn the FINRA rules before becoming involved, but that he "became aware of procedure somehow. It might have been from a phone call to another lawyer. I don't remember reading the actual procedure." (Clark Tr. at 226:15-227:13) Defendant Harmon also admitted that Boardman v. UBS was her first ever arbitration. (Harmon Tr. at 37:22–40:24) As a result of their ignorance of the proper procedure and inexperience in both the forum and the area of law, Defendants deviated from the standard of care from their very first filings.

<u>Defendants' arbitration pleadings were deficient</u>. The statement of claim is deficient in that, *inter alia*, it is vague, conclusory and incomplete, devoid of factual content regarding the claimant

---

[4] A copy of Defendants' Answers to Plaintiff's First Set of Interrogatories is annexed to the Campbell Affirmation as Exhibit 1.

or the allegedly wrongful conduct and citations to any standards by which to judge the respondents' conduct.[5]  (Robbins Report at p. 7)  Moreover, Defendant Clark testified that he did not write the statement of claim; rather, one of his "experts," a non-lawyer named William Danzell, wrote it.[6] Defendant Clark was aware that Danzell is not a lawyer.[7]

Mr. Robbins' Report goes on to explain that the statement of claim fails to educate the arbitrators as to the relevant facts upon which Plaintiff's claims are based (by omitting facts that would have told the story of the claimant, her investment experience, her investment objectives, *etc*.) and fails to discuss the specifics of any of the relevant investments, such as the MMAP contracts or their complexity, the allegedly unsolicited options trading, or any other transactions, such as the size and type of margin loans and their purpose (*e.g.*, the $1.2 million loan to re-concentrate her account in Synovus stock).  (*Id*. at pp. 7-8)  Moreover, Mr. Robbins opines that the statement of claim actually harms the case by misstating the causes of action and over-reaching in the assertions made, *e.g.*, by making an unnecessary fraud claim that raised the standard of proof to get the same desired result.  (*Id*.)

---

[5]    A copy of the statement of claim produced by FINRA from its arbitration file pursuant to subpoena (bearing FINRA production numbers FINRA 00282-00284) is annexed to the Campbell Affirmation as Exhibit 2.

Defendant Clark testified that a letter dated June 3, 2009, on Clark and Clark letterhead (bearing Defendants' production numbers Clark 00080-00082, annexed as Campbell Exhibit 3 and also marked as Plaintiff's Exhibit 7 in Clark's deposition) is the document that was filed as the statement of claim (transcript of deposition of Fred S. Clark, dated March 28, 2010 ("Clark Tr."), at 65:13-17; and 67:21-23), the document does not appear in the documents produced by FINRA.  The Arbitration hearing transcript does not identify the pleadings forwarded to the arbitration panel.

The deposition transcripts cited throughout this memorandum are collected together for the convenience of the Court and annexed as Exhibit 21 to the Campbell Affirmation.  The cited transcript deposition pages of Fred S. Clark dated March 28, 2011, are included in Campbell Exhibit 21 as 21A; the pages from the deposition of Heather Harmon taken on March 29, 2011, are Exhibit 21B.

[6]    Clark Tr. at 25:10-13 ("he [Danzell] ended up preparing the claim with me is my recollection, meaning in my presence he did most of the work on the claim); 31:15-17 ("He [Danzell] had I think volunteered that he was going to prepare the statement of claim, and he did that . . .").

[7]    Clark Tr. at 31:18-20.

Defendants' expert, Mr. Anderson, states merely that a statement of claim does not breach the standard of care because FINRA rules require only that it specify the relevant facts and remedies requested, not that it included "a laundry list of every conceivable claim that Boardman may have had against the respondents," including her strongest claim of unsuitability. (*Id*. at p. 3) Mr. Anderson does not point to the relevant facts included in the statement of claim or opine as to why such a statement of claim meets the standard of care.

The statement of claim provided by FINRA (Campbell Exhibit 2) does give a few facts, such as the claimant's age (presumably when she opened her UBS account) and that she opened her account with $3 million in assets and lost all of her assets (FINRA 00282); but beyond that it provides only declaratory statements. For example, it states that: (i) the investments did not meet her investment objectives (which are never stated); (ii) the advisor violated FINRA and New York Stock Exchange rules (but without explaining how, or what the rules say); (iii) the portfolio was leveraged in violation of United States Treasury Regulation T (but without explaining what that is or what it provides); and (iv) the advisor engaged in misrepresentations, material omissions and other fraudulent means and was negligent (but without specifying a single example). (*Id.* at FINRA 00282-283) Moreover, not one single investment or recommendation is identified except generally as "equity option and convertible bond portfolios." *(Id.* at FINRA 00282) The letter identified by Defendant Clark as drafted with Mr. Danzell and filed with FINRA as the statement of claim as the document filed with FINRA on June 7, 2009 (Campbell Exhibit 3), differs only slightly from Campbell Exhibit 2 and does not add any facts.

Furthermore, Defendants' filed response to UBS's counterclaim for an unpaid debit balance of more than $134,000 was non-responsive.  In fact, that document[8] fails to offer even a general denial of liability for the debt, or otherwise raise specific defenses or offer specific facts or documents in opposition to the allegations of the counterclaim.  Rather, this two-page document does no more than repeat some of the unsupported allegations in the statement of claim and assert that they somehow preclude recovery by UBS.

<u>Defendants were negligent in the selection of arbitrators</u>.  The record is abundantly clear that Defendant Clark failed to follow the process for selecting arbitrators to hear Plaintiff's claims. Exhibit 5 to the Campbell Affirmation is the FINRA "Arbitrator Selection Form" filed by Defendants in the arbitration.[9]  The Arbitrator Selection Form is the method by which parties are presented with the names of possible arbitrators and given an opportunity to strike up to twelve and to rank the others in order of preference. Using what can only be described as an eccentric set of criteria to mark the Arbitrator Selection Form with a 1, a 2 and a 3, and to place a check mark ($\sqrt{}$) in the spaces for striking and ranking four of the individual arbitrators, Defendant Clark admitted that: "I did my own selection methods" (Clark Tr. at 95:16).  Questioned extensively about this form and his marks (Clark Tr. at 95-99), Defendant Clark was unable to articulate why he did not utilize any of his available strikes or indicate an order of preference for any other arbitrators beyond "In any of the cases I selected somebody that I thought I could relate to."  (Clark Tr. at 97:4-5).  Under the

---

[8]    Annexed as Exhibit 4 to the Campbell Affirmation and bearing production numbers FINRA 00408-410.

[9]    This document also was marked as Plaintiff's Exhibit 16 in the Clark deposition.  The testimony relating to it begins at page 138 of the Clark transcript.

FINRA Code of Arbitration Procedure Rule 12403 provides for providing such lists, consisting of 8 arbitrators from each of 3 rosters: the non-public arbitrator roster the public arbitrator roster; and the public arbitrator chairperson roster. *Id.* at 12403(a)(2).  Rule 12404 permits the parties to strike up to 4 from each list and mandates that they "shall rank all remaining arbitrators on the lists in order of preference with '1' indicating the party's first choice, and '2' indicating the party's second choice, and so on." *Id.* at 12404(b).  The FINRA Rules cited here from the FINRA Code, as amended in 2007 and in effect in 2009, are annexed as Exhibit 6 to the Campbell Affirmation for the convenience of the Court.

process followed by FINRA "[i]f a party does not strike through or cross out an Arbitrator's name, the Arbitrator will be deemed acceptable."[10]

Furthermore, Defendant Clark eventually admitted that he did not read the bulk of the disclosure reports giving background information about the proposed arbitrators. (Clark Tr. at pp. 147-158)  His testimony about reviewing the publicly available arbitration awards for the proposed arbitrators, is confused at best, ranging from: he didn't read any (Clark Tr. at 107:2-23); to his office manager read them (*id.* at 108:7-20); and, eventually, he did read them read them after all (*id.* at 108:22-25).

After the panel had been appointed one arbitrator, Mr. Barnhardt (whose awards reflect that he has ruled for brokerage houses in 62% of his arbitrations, Robbins Report at p. 5), disclosed that he was also sitting on no fewer than four (4) other arbitration panels in which UBS was a party, one of which involving not only UBS, but also the other two respondents **and** the same lawyers as those in the Boardman arbitration.  (*Id.* at p. 6)  Mr. Barnhardt's disclosure raised serious issues about this arbitrator's possible partiality and exposure to *ex* parte communications with the respondents' counsel and should have given rise to a serious challenge.  (*Id.*)  Defendants took no notice of the risks to their client posed by Mr. Barnhardt's February 2010 disclosure and took no steps to explore the disclosure or challenge his appointment to the panel.  (Clark Tr. at 172:24-173:25)[11]

Plaintiff's expert opines that Defendants' failure to follow the arbitrator selection process and to investigate the award history of the appointed arbitrators was one of the breaches of the standard of care that led to the adverse result.  (Robbins Report at p. 5, citing to the Arbitrator

---

[10]   See Campbell Exhibit 7, letter from FINRA to Fred S. Clark dated September 15, 2009, and bearing production numbers FINRA 00129 – 135, "Arbitrator Ranking Form."

[11]   A copy of Mr. Barnhardt's February 2010 disclosure is annexed as Exhibit 8 to the Campbell Affirmation.  (FINRA production numbers 0082-86)

Selection Form and testimony discussed above.)  Defendants argue that, because Mr. Robbins personally has not permitted his past decisions to affect his decisions moving forward, he cannot support his opinion that Defendants' mishandling the selection of arbitrators (in fact, failing to take part in selection) was a cause of Plaintiff's loss.  Motion at p. 8.  This argument is facile; Mr. Robbins' expert opinion is not about him personally. Also, as shown above, Defendants' failure to investigate or even read the arbitrators' disclosures and past awards is but one of the many failures surrounding the appointment of arbitrators that caused him to reach his conclusion; ignoring the specific failure to explore or challenge the disclosure by Mr. Barnhardt in February 2010.

Defendants' expert does not address the issue and does not appear to have reviewed Campbell Exhibits 5, 7 or 8.  (Anderson Report at pp. 8-9)  Neither its list of specifically identified documents nor the range of unspecified documents (identified as Clark 480 through 2569) includes the Arbitrator Selection Form (Clark 04479) or the FINRA letter transmitting it (FINRA 00129-135).

Defendants Ignored the FINRA rules governing discovery.  Defendants served discovery on the respondents prematurely, soon after the filing of the statement of claim, instead of waiting until 45 days after the statement of claim was served pursuant to FINRA Rule 12507.[12]  At his deposition Defendant Clark admitted he was ignorant of the discovery rules and excused his premature

---

[12]    Defendants served discovery on August 9, 2009, approximately one month after the statement of claim was filed. Rule 12507 states that discovery beyond the presumptively required documents to be produced pursuant to Rule 12506 (discussed below), may be served "45 days . . . after the Director serves the statement of claim." Rule 12507(a)(1).  A true and correct copy of Defendants' discovery requests in the arbitration (FINRA 00494-504) is annexed to the Campbell Affirmation as Campbell Exhibit 9.

Rule 12506 (Campbell Exhibit 6) provides that document lists contained in the FINRA discovery guide "are presumed to be discoverable." Rule 12506(a).  The time to produce documents on the applicable document lists is "within 60 days of the date that the answer to the statement of claim is due." *Id.* at 1206(b).  The answer to the statement of claim was filed on October 6, 2009.  A true and correct copy of the respondents' answer in the arbitration (minus exhibits) is annexed to the Campbell Affirmation as Campbell Exhibit 10 (FINRA 00313-328).

requests with the off-hand phrase:  "There is no such thing as too early to a lawyer."  (Clark Tr. at 228:18 – 19)

Defendants' discovery requests also were negligently served because they were served on the UBS office on Hilton Head, which was no longer owned by UBS, a mistake that would have been avoided had they waited until they received the respondents' response, *i.e.*, 45 days after the claim was served.  FINRA Rule 12303(a)  Of course, the respondents objected, but not until three months later, in November 2009.[13]  When examined about the respondents' objection, Defendant Clark admitted that:

> Q.  Do you recall having conversations with Mr. Holston regarding the discovery that you served?
>
> A.  Yes, we had a discussion about it.
>
> Q.  And did Mr. Holston tell you that he believed that your request violated FINRA rules?
>
> A.  Yes, it is in the letter.  He probably told me.
>
> Q.  And because you had violated the rules he had a right to object.  Can you recollect what objection he raised?
>
> A.  Like I say we had a discussion and it was not adversarial.  I mean it was – he probably objected and I said okay, that is fine.
>
> Q.  But he pointed out that you served the discovery requests at an office no longer owned by UBS, didn't he?
>
> A.  Yes, I told him that was fine.  That, you know, if he had information -- that he ended up doing some response, but I forgot what it was.  I remember he told me, he says if you notice I agreed with you on something, and he did that by telephone telling me that and then I saw it.

---

[13]    Letter from Wes Holston, Esq. of UBS dated November 5, 2009 and respondents' Response to Discovery Inquiries dated November 9, 2009.  The respondents' responses interpose numerous objections but agree that they "will produce" or "is producing" some categories of documents, but without saying when they will be delivered.  A true and correct copy of the Holston letter (bearing FINRA number 441-442) is annexed to the Campbell Affirmation as Exhibit 11; a true and correct copy of respondents' Response to Discovery Inquiries (identified as Clark 00443-449) is annexed to the Campbell Affirmation as Exhibit 12.

Clark Tr. at 231:20 - 232:20. Mr. Clark did not know whether or not he reserved re-served discovery on Plaintiff's behalf (*id.* at 237:9-10).

Not until March 3, 2010, just six (6) weeks before the arbitration hearing, were all the documents due in response to Defendants' document requests delivered to them. Defendant Clark, nevertheless, was unconcerned; he relied on respondents' counsel to produce what was needed in timely fashion, took no steps to speed production, and did not feel any need to have the respondents' documents to prepare for the hearing before March 3, 2010:

> Q. Did you consult the FINRA rules to see if he [respondents' counsel, Wes Holston] was right after you got his letter on or about November 9, 2009 telling you you violated the FINRA rules?
>
> A. I know.
>
> Q. Did you consult the rules to see if he was right?
>
> A. I relied on him. I had that much respect for him then and now.
>
> Q, Is it your testimony that you did not believe that you had a professional responsibility to your client to independently of opposing counsel to read, learn and understand the Code of Arbitration Procedure applying to your case?
>
> THE WITNESS: If there was an absolute need for me to have it on November 9 on such specific date, I would have become aware of it, I would have checked the rules. But there was no absolute necessity of having it on a specific day. It was just to have it. That resulted in my working with him and communicating with him, and I got the information I needed.
>
> Q. Is it your testimony that no adverse consequences resulted from the fact that you did not receive discovery from UBS or the other respondents before March 3, 2010 and that you did not even know the substance of the objections or which document requests that they were objecting to before March 3, 2010, six weeks before the arbitration hearing?
>
> THE WITNESS: There was nothing that disrupted in any way our preparation or our discovery of information. We were not handicapped or hurt in any way by any delay. If it was I would have called him.

Clark Tr. at 251:19-253:16.

The arbitration respondents eventually produced approximately 13,000 pages of discovery by March 3, 2010, for a hearing that was to begin on April 13, 2010. The mediation agreed to by both parties was held on March 31, 2010, just two weeks after receipt of many of respondents' documents. Defendant Clark, who apparently was unaware of the document lists identified in

16

FINRA Rule 12506, the FINRA Discovery Guide, and in related notices to members (Clark Tr. at 259:24 – 260:17; 262:23 – 263:12), was unconcerned when he did not timely receive the documents respondents were required to produce pursuant to Document Production Lists 1 and 2 (pursuant to FINRA Rule 12506(b)(1)), which were due 60 days after service of the statement of claim on July 27, 2009 (FINRA 00509-514).   Instead, he trusted respondents' counsel to produce what was needed in time for the hearing (Clark Tr. at 249:14 – 250:5) and did not even check to see if Defendants had received the documents mandated by Rule 12506:

> Q.  Mr. Clark, thank you for your answer.  Now answer the question:  Did you understand what was required by the provisions of NTM 99-90?
>
> A.  Whatever I learned about it I learned from Wes Holston.
>
> Q.  The attorney for UBS?
>
> A.  Yes.  I totally trusted him.
>
> Q.  Did you check the documents you received on or after March 3, 2010 against the requirements of NTM 99-90 to make sure –
>
> A.  No.

(Clark Tr. at 263:13-16)[14]  In fact, UBS objected to producing many of the documents and declined to produce UBS compliance manuals (Campbell Exhibit 12 at Clark 00446), and numerous other documents identified in document lists identified in FINRA Rule 12506(b)(1) as documents that "must" be produced 60 days after the answer was due  (*i.e.*, December 9, 2009, 60 days after the answer was filed on October 9).[15]  There is no evidence in the record that Defendants ever provided the requested additional information to enable UBS to provide the documents.  Defendant Clark was not concerned to discover what documents were withheld from production pursuant to the respondents' objections,  did "not know if I needed any other documents" and was "satisfied" that

---

[14]    NTM 99-90 is a FINRA Notice to Members and incorporates the document production lists in Rule 12506(b)(1).  A copy is annexed to the Campbell Affirmation as Exhibit 13.

[15]    In addition to not producing the compliance manual until Defendants identified specific sections they believed were in issue, UBS also refused to produce, *e.g.*, documents in NTM 99-90 Lists 5  (Clark 00447), 7, 9 and 13 (Clark 00448).

he had enough of what he needed to proceed.  (Clark Tr. at 258:18 – 259:11)  Defendants did send a letter detailing alleged deficiencies in the production (Clark 001136) however, the record shows that respondents did not respond to his letter until March 2, 2010.[16]

Having failed to ensure that they timely received the respondents' discovery documents in accordance with FINRA Rules or within a reasonable time before the hearing, the record shows that the Defendants also did not prepare the witnesses they planned to call in the arbitration.  For example, Mrs. Boardman's entire preparation for the hearing was a short meeting with Defendant Harmon the night before.  Mrs. Boardman testified that her contact with her lawyers before the hearing was limited to: (i) the initial meeting where she engaged them; (ii) a few phone calls; (iii) during the car trip to the mediation on March 3l 2010; and (iv) the hour or so the night before the hearing.  (*See* transcript of deposition of Mrs. Sandra Boardman February 4, 2011, at 77:13-78:19 and 80:20-84:13, included in Campbell Exhibit 21 as Exhibit 21C.)

Defendant Harmon admitted to an absence of knowledge regarding the FINRA rules and the case law that a skilled, knowledgeable and experienced attorney would be expected to know (Harmon Tr. at 37:22–40:24), and that she did not consult any authorities regarding FINRA arbitrations.  (*Id.* at 49:3-25)  Questioned about the respondents' Response to the Statement of Claim and Counterclaim in arbitration (Campbell Exhibit 10), Ms. Harmon admitted that she neither read nor researched the cases the respondents had cited as authority for the positions being advocated by the respondents in opposition to Plaintiff's claims:

    Q.  On page 12 there is some cases that are cited.  Did you read those cases?

    A. No.

    Q. Did you do any research to determine the status of those cases and the law as of the date

---

[16]  Copies of Defendants' January 18, 2010, letter (CLARK 01136) and respondents' response (BOARDMAN 000100-104) are annexed to the Campbell Affirmation as Exhibits 14 and 15, respectively.

that you were going to be holding the hearing?

A. No.

(Harmon Tr. at 40:16 – 24, Campbell Exhibit 21B)  She then admitted that she had no knowledge whether anyone else did the research either (*id*. at 41:14-15).   Questioned further about legal research on the claims in general, Ms. Harmon admitted that she did not do any research at all about Plaintiff's claims in the arbitration other than the supposed (and misguided) Treasury Regulation T claim:

A.  I have no knowledge of what anybody else did, sir.

Q.  You have no knowledge, okay.  You did not personally do any legal research into the case law that would apply to your client's claims, is that right?

THE WITNESS:  On this page?  No.

 BY MR. CAMPBELL:

Q.  No, just in general you did not do any legal research with respect to the case law addressing the issues that were to be tried in Miss Boardman's case?

BY MR. CAMPBELL:

Q.  Is that correct?

A.  That is not correct.  On some of the website's (*sic*)that Mr. Danzell gave me that had rule Reg T, other things like that that we were using, there were cases on those website's (*sic*).  I didn't research.  I read the cases that were listed underneath the rules.

Q.  And then what did you do with them?  Did you print them out?

A.  I can't remember.

*Id.* at 41:16-42:13.  She likewise could not recall what she did with those cases after reading them.

(*Id.* at 42:14-16)   Based on this meager *quantum* of research into a "laundry list of every conceivable claim" (Anderson Report at p. 3), Defendants' determined that the arbitrators did not need a pre-hearing brief to explain or support any of the laundry list of claims:

Q.  Did you consider whether or not it would be useful for the arbitrators to be given some legal authority for the propositions that you were going to present to them in support of Sandra Boardman's claims?

A.  Yes.

Q.  And what did you decide?

A.  That we didn't file a brief.  We didn't do it.

Q.  You decided you didn't need to present any law?

 A.  That is what we felt.

Q.  Had you learned any law relating to the claims that were being presented on behalf of Miss Boardman?

 A.  Other than what I have already testified about?

Q.  Well, did you learn enough law so that you would know what the law was out there and whether or not it would be useful?

 A.  I think so.

Q.  What law did you learn?

THE WITNESS:  Other regulations and the violations and the case law

that was on the website I told you about underneath the regulations.

(*Id*. at 61:13 – 62:16)

The notice served by Defendants identifying the witnesses they might call at the hearing to carry their burden of proof on Mrs. Boardman's claims does not identify a single UBS employee or even the named respondents as witnesses.[17]  Pursuant to FINRA Rule 12514(b), parties "must provide each other party with the names and business affiliations of all witnesses they intend to present at the hearing."  (*Id.*)  Further, "Parties may not present any . . . witnesses not identified in accordance with this rule at the hearing unless the panel determines that good cause exists for the failure to . . . identify the witness."  (*Id.* at Rule 12514(c))  Defendant Harmon admitted that Defendants had no intent to call the respondent financial advisors on their presentation of Plaintiff's case in chief but changed their minds only "When it became clear that they were not going to be on cross-examination we put them on as adverse witnesses."  (Harmon Tr. at 58:7-10).  They were fortunate the arbitrators allowed them to call respondents Ruckno and Stuckart after they had examined all of the witness they had given notice that they would call; however, the witness order itself exhibited negligence (Robbins Report at p. 11) and, as explained below, when the two

---

[17]   A true and correct copy of Defendants' so-called "20-day" notice (marked as Exhibit 26 in the Clark deposition) is annexed as Campbell Exhibit 16.

individual respondents were examined, Defendants failed to address critical issues and to exploit key admissions.

(ii).    **Negligence in the mediation.**    Expert David Robbins identifies negligent failure to prepare for the mediation (which Defendant Clark called "What a waste of time", Clark Tr. at 290:21) as causing it to fail (Robbins Report at p. 26). Mr. Robbins opines that, in light of the facts available to Defendants through discovery from UBS (albeit recently received) and the governing law, rules and regulations, proper preparation and presentation of the factual and legal bases for Plaintiff's case to an experienced mediator chosen by Defendants would have resulted in a settlement at the mediation "had competent counsel been representing Mrs. Boardman." (Robbins Report at 4) Defendant Clark testified that he did not provide anything in advance to the mediator, not even a copy of the statement of claim. (Clark Tr. at 291:24-292:5)

(iii).    **Negligent hearing presentation**.    Defendant Harmon handled the questioning on behalf of Plaintiff during the arbitration hearing. While Ms. Harmon bears equal responsibility with her partner, Fred S. Clark, for errors in case preparation and presentation, and the absence of knowledge, skill and experience necessary to represent Plaintiff in the FINRA arbitration,[18] the Robbins Report identifies numerous examples of deviations from the standard of care by Defendant Harmon during the hearing (*e.g.*, at pp. 9-14), which also were a direct and proximate cause of Plaintiff's injury.

For example, notwithstanding the "strongest and most important claim" of "unsuitable recommendations in violation of NASD Rule 2310" (Anderson Report at p. 3), Ms. Harmon admitted that she did not believe that her client's age (65 in 2001 when she opened her UBS

---

[18]    Ms. Harmon admitted that she had no prior experience whatsoever in FINRA arbitrations before she undertook to represent Mrs. Boardman in the arbitration. Transcript of the deposition of Heather S. Harmon, Esq., dated March 29, 2011 ("Harmon Tr."), at 22:5 – 9 ("The only arbitration I have been involved in is Miss Boardman's.").

account, 71 in 2007 when he recommended a fourth reinvestment in the UBS MMAP contract) was

relevant to her claim:

> Q.  Would you expect to as you sit here today knowing what you know and knowing that you were trying to make a suitability case, do you believe  you should have asked Mr. Ruckno what Miss Boardman's age -- what impact Miss Boardman's age would have on the determination of the  suitability of the investments he was recommending?
>
> A.  No, I don't think it would have mattered.  There were several other factors that were more important.
>
> Q.  Do you know what risk profile is?
>
> A.  Yes, I do.
>
> Q.  Would you consider it -- did you consider it relevant to ask the broker how the age of the customer impacts the risk profile?
>
> A.  No, sir.
>
> Q.  Did you consider asking the broker in this unsuitability case what impact the age of the client would have on the investment objectives analysis?
>
> A.  No.  Because there are plenty of clients at 65 that have different investment objectives.

(Harmon Tr. at 118:19-119:9)[19]    In fact, Ms. Harmon did not ask David Ruckno, the person

primarily responsible for all of the recommendations to Plaintiff and who was charged pursuant to

the "know your customer" rules of the various exchanges to know his customer and make only

suitable recommendations (Meyerson Report at pp. 3-4), any questions at all about Mrs.

Boardman's investment objectives or risk profile during the arbitration hearing.   Fortunately,

Ruckno testified to it anyway; in response to a question about telling people he had doubled

Plaintiff's money during Ms. Harmon's re-direct, Mr. Ruckno volunteered his understanding about

---

[19]    In a curious omission given the focus of Defendants on supposed evidence of unsuitable recommendations during the arbitration and in this case, Defendants' experts do not address the investment objectives or risk profile for Mrs. Boardman at any point in her relationship with UBS.  Nor do they address the UBS account opening documents which contain some risk analysis and information identifying Plaintiff's investment objectives.  Plaintiff's compliance rules expert, Stanley Meyerson, identifies conflicting customer data and mutually exclusive investment objectives in the UBS account forms that support the proposition that the investments were unsuitable in light of the actual investment objectives as identified in the original account opening document and testified to by Ruckno and Mrs. Boardman, as well as that UBS failed to supervise the management of Plaintiff's account and the activities of respondent Ruckno in making recommendations to his client.  Meyerson Report (Motion attachment 2) at pp. 7-8 and Exhibits 2, 5 and 6.

Mrs. Boardman's investment objectives saying that:

> I've never implied once that I've even doubled her account. **The strategy that I always use with Ms. Boardman was asset protection.** It was boring trying to protect the assets. It wasn't trying to double her money or triple her money. **It was trying to protect her money.**

(April 14 Arb. Tr. at pp. 209:22-210:3, emphasis added)  In a startling demonstration of her lack of the knowledge, skill and experience necessary to represent Plaintiff in the arbitration, Defendant Harmon ended her re-direct examination at this point and sat down with a curt "Okay.  Thank you Mr. Ruckno." (*Id.* at 210:4)  Defendant Clark did not intervene.  Thereafter, as noted below (Point I.B.2.(iv)), in defense of the motion to dismiss, Defendants failed to point to this key admission, which directly supports Plaintiff's unsuitability claims, or to identify documents and testimony that refute the defense that all of the investment recommendations were suitable because they were consistent with "the strategy of asset protection . . . to protect her money" (*Id.* at 209:23-210:3), which would, at least, have been "some" evidence that Defendants had made a *prima facie* claim for unsuitability.

Other claims in the statement of claim in arbitration (Campbell Exhibit 2) not supported by the arbitration record presented by Defendants include:  (a) violation of NYSE and NASD rules (the arbitration record does not contain copies or even summaries of the allegedly violated rules; (b) that the UBS account statements are misleading (Defendants did not submit a single account statement into evidence, and did not question a single UBS employee about the allegedly misleading account statements); and (c) breach of the account agreement contract by failure to follow investment objectives; and failure to supervise.  Defendants deliberately did not identify on their 20-day witness list (Campbell Exhibit 14) and did not call a single UBS compliance officer employee to address any of these claims.  The reason given for the decision not to call any UBS witness:  "I don't recall.  I assume their testimony would not be favorable." (Harmon Tr. 284:13-16)  As a

23

result of that decision, no evidence at all was presented to the arbitrators on the failure to supervise or the alleged regulatory rule violations.

Additionally, an important claim in the arbitration is that UBS misrepresented Plaintiff's net worth.  (Campbell Exhibit 2 at p. FINRA 00283)  Claimant's arbitration exhibit 1[20] includes spreadsheets showing the reported balances on the statements versus the actual or "real balances" reported to Plaintiff.  Defendants could have made the point by reference to the first pages of just two monthly statements: those for January and February 2009.  The portfolio net value as of the end of January is shown to be $1,631,145.  The January month-end value reflected on the February statement mysteriously is $650,000 less.[21]  This very large difference in numbers that should be identical from one month to the next is among the many such discrepancies not addressed by Defendants, not placed in evidence, not used in any way in support of Plaintiff's claims.  Even if the testimony from Ruckno or another appropriate UBS person turned out to be "not favorable," at least Defendants would have presented **some** fact evidence of the misleading statements in support of their client's fraud, misrepresentation and related claims.  As it is, Defendants did not challenge any UBS witness and did not submit any evidence in support of those claims beyond Mr. Kessler's unsupported spreadsheets, which, with his evidence, is expert testimony, not fact evidence by a person with personal knowledge.

(iv).   **Negligent failure to oppose the motion to dismiss** .   In response to the arbitration respondents' motion to dismiss (about which Defendants were warned during the hearing),

---

[20]   A true and correct copy of Claimant's arbitration exhibit 1, bearing FINRA production numbers FINRA 00817-827, is annexed to the Campbell Affirmation as Exhibit 17.  Mr. Kessler testified at pages 157-220 of the April 13 Arbitration Transcript ("April 13 Arb. Tr.").  For the convenience of the Court, the April 13 and 14, 2010, arbitration transcripts are annexed to the Campbell Affirmation as Exhibit 22.

[21]   The first page of each of the January and February 2009 monthly statements are attached to the Campbell Affirmation as Exhibits 18A and B, respectively.

Defendants did not argue appropriate facts supposedly presented in the testimony or in the supporting exhibits; nor did they present any appropriate legal authority, or cite to any rule or regulation, supporting the existence of a *prima facie* case on the evidence presented.[22]  For example, having finally induced respondent Ruckno (the UBS broker) to admit that Plaintiff's investment objectives were income and preservation of capital, Defendants inexplicably fail to mention this key fact in opposing the motion.  Having elicited that admission, Defendants were obligated to remind the arbitrators and to explain to them, *e.g.*, what it means for the suitability analysis, and how FINRA regulations and ample case law require them to judge the suitability of each investment recommendation to Plaintiff in light of that suitability analysis as her circumstances changed between ages 65 and 74 while the account was open and recommendations were being made.  That is, Defendants, in the exercise of the requisite degree of learning, skill and ability which is necessary to the practice of the profession of law (SCACR Rule 407), were obligated to know and, after two days of testimony, be able to argue to the panel: the legal standard applicable to the motion they were being asked to grant; the specifics about Plaintiff's claims as set forth in the statement of claim; the record of facts (that is, testimony and documents) in evidence; and the law forming the bases for each of the Plaintiff's claims.

None of this was done.  Defendants did not set out the specifics of the claims in the statement of claim, did not point to Mr. Ruckno's admissions about Plaintiff's investment objectives, nor did they even inform the arbitrators that there was evidence presented that constituted a *prima facie* case that the respondents should be required to answer.  For example, they did not explain the evidence that: (i) the multiple MMAP contracts were not in any or in all cases

---

[22]    Defendants' entire argument in opposition to the motion to dismiss for failure to present a *prima facie* claim is contained in just 25 lines of transcript.  Arbitration hearing transcript dated April 14, 2010 ("April 14 Arb. Tr."), at 219:9 - 18 (argument by Defendant Clark); and 219:19 - 220:12 (argument by Defendant Harmon).

suitable in light of the client's age, knowledge, education, experience, and conservative investment objectives; (ii) the options trading in the account was unsuitable for an inexperienced and conservative investor; (iii) the margin loan of $1.2 million and carrying interest charges of around $36,000 per annum on average was not suitable to repurchase a concentrated position in Synovus stock in late 2002; or (iv) the repurchase of a concentrated position in Synovus stock was itself not suitable.  In short, Defendants were obligated to show that they had done their job and made a *prima facie* case that the respondents should be required to defend, an obligation they singularly failed to fulfill.[23]  Mr. Robbins gives his opinion that Defendants were negligent in failing to present available evidence, to call appropriate and available witnesses and to ask necessary and appropriate questions to make a *prima facie* case for unsuitability, fraud, misrepresentation or anything else. (Robbins Report at pp. 24-30)  The Court might find that the fact of malpractice and its role in the damaging adverse outcome is self-evident on this record; however, there is at least a record presenting an issue for the jury to decide.

Additionally, having been warned in advance that respondents would not present a defense [24] Defendants could have, but did not, ask the arbitrators for time to submit a memorandum of law on the legal and factual issues presented by the respondents' oral motion.  FINRA rules specifically

---

[23]    The foregoing list is not exhaustive, merely illustrative of the many failings evidenced in the arbitration transcript.

Defendant Clark's argument tells the panel that Mrs. Boardman must be presumed to have told the truth (April 14 Arb. Tr. at 219:11 – 12), which is incorrect in a motion to dismiss at the close of the plaintiff's evidence when the judge in a bench trial, or, in this case, the arbitrators acting as judge, may make credibility determinations.  Defendant Harmon argues, in conclusory language and without any back-up or substance, that expert witness Craig Kessler testified to $3 million in fees (*id*. at 220:20 – 22), that (non-expert) witness Emily Johnson testified that the MMAP contract was unsuitable (*id*. at 219:22 – 220:2), that expert witness Danzell testified to violations of Treasury Regulation T and that there was evidence that the UBS statements were misleading (*id*., at 220:3 – 9).  Neither Mr. Clark nor Ms. Harmon made any reference to documents in evidence during their arguments in opposition to the dismissal motion.  Of course, having also failed to put any expert testimony on suitability, account opening documents, regulatory rules, account statements, or other supporting documents into the record, Defendants in fact had nothing more concrete to offer.

[24]    Respondents' counsel advised Defendants in advance that they would not be calling any witnesses (Harmon Tr. at 46:8-23), which can only have meant they were planning to move to dismiss at the close of Defendants' case.

permit arbitrators to agree to accept additional submissions from any party.[25]   In light of

Defendants' admitted and demonstrated lack of knowledge, skill and experience in FINRA

arbitration proceedings, requesting permission to file a brief to present evidence that they had

sufficiently proved a *prima facie* case would have been prudent and a sign that they were exercising

diligence in the prosecution of the litigation and exercising reasonable skill in the application of

their knowledge and skill on behalf of their client as required by the Rules of Professional Conduct.

*Norris v. Alexander*, *supra*, 246 S.C. at 18, 142 S.E.2d at 217.

Defendants further argue that Mr. Robbins' conclusion that the myriad instances of

malpractice caused the adverse outcome in the arbitration is speculation because he does not explain

how they caused the result.   (Motion at pp. 7-8)   This assertion is disingenuous; Mr. Robbins'

expert conclusion is fully supported by a comprehensive record of malpractice, and it does not have

to show exactly how the overwhelming evidence of malpractice caused the outcome; rather, to

prove legal cause there must be evidence "establishing the injury in question occurred as a natural

and probable consequence of the defendant's act."   *Small, supra,* 329 S.C. at 463, 494 S.E.2d at

843.   Drawing all reasonable inferences from the facts in the light most favorable to the non-moving

party   (*In re Elwood Dean French*, 499 F.3d at 352), Mr. Robbins' conclusion that Defendants'

gross incompetence as revealed by the record caused the adverse result in the arbitration is at the

least a reasonable inference to be drawn from the evidence.   *Sims v. Hall*, 357 S.C. 288, 298, 592

S.E.2d 315, 320 (Ct. App. 2005) ("The defendant may be held liable for anything which appears to

be a natural and probable consequence of his negligence.") (citations omitted).

---

[25]   The FINRA rules do not preclude briefing at a party's request.  They do, on the other hand, provide for notice and
time to respond to written motions (Rule 12503) but do not address oral motions; nor is there a rule specifying a process
for motions to dismiss at the conclusion of a party's case in chief.  *See* Rule 12504(b).  However, the panel has wide
authority to impose its own process in an appropriate case.  *See e.g.*, FINRA Rule 12608 providing that the panel may
request "or agree[] to accept additional submissions from any party." Rule 12608(c).

Defendants' arguments merely attack the particular conclusion, they do not demonstrate that the evidence relied upon by Mr. Robbins is susceptible of only one inference, *i.e.* that the malpractice was not the cause of the result. They can make their attack only by carefully avoiding discussion of the masses of evidence that Defendants lacked the knowledge, skill and experience to discharge their obligations and failed to provide competent representation to their client. Mr. Robbins' opinion that "defendants' conduct was the probable cause" of the adverse result below sufficiently satisfies the proximate cause standard in South Carolina as: "testimony that is such 'as to judicially impress that the opinion . . . represents his professional judgment as to the most likely one among the possible causes.'" *Baughman v. American Telephone and Telegraph Company*, 306 S.C. 101, 111, 410 S.E.2d 537, 543 (1991). Therefore, Mr. Robbins' testimony raises a question of fact as to whether Defendants' malpractice was the cause of the adverse result in the arbitration, and summary judgment is inappropriate.

## C. <u>Cause in Fact</u>

Defendants' argue that, even if Mrs. Boardman can show they committed malpractice, she was not damaged by their negligence because: (i) there is no evidence of damages; and (ii) in any event, her losses were caused by her own behavior and there is no evidence that it was caused by the acts of the arbitration respondents. Defendants are disingenuous to argue that Plaintiff has not specified any damages or any concrete basis for any damages resulting from Defendants' malpractice. In fact, the record from the arbitration hearing (which, of course, was gathered and presented to the arbitrators by these Defendants) shows that Defendants submitted expert damages evidence--albeit clumsily, without proper back-up and unsupported by case law or advocacy. That evidence is part of the discovery here, having been produced by the Defendants, FINRA, and Craig Kessler, the expert hired by Defendants for the arbitration. Plaintiff's case here is that, absent Defendants' negligence, damages (evidenced by the testimony and documents that should have

28

been presented to the arbitrators) would have been awarded. Mr. Kessler is a fact witness who will testify to the damages evidence he was prepared to present as an expert witness in the arbitration—*i.e.*, the damages that Plaintiff would have received but for Defendants' negligence. Thus, in this malpractice case, damages are a question of fact, not a matter for new and different expert testimony.

Claimant's exhibit 1 in the arbitration is a multi-page document created by Mr. Kessler in support of the damages claim presented in the arbitration.[26] At the arbitration hearing Mr. Kessler testified about this exhibit,[27] which shows, *inter alia*, fees charged to Mrs. Boardman in connection with the unsuitable and improper investment recommendations made by the arbitration respondents in the amount of $3,178,781. (Campbell Exhibit 17 at FINRA 00817) Arbitration exhibit 1 also shows that Mrs. Boardman withdrew personal expenses in the amount of $972,603, plus taxes in the amount of $242,917 and loan payments of $501,604.[28] (*Id.*) In addition, Mr. Kessler produced documents in this case that were not presented to the arbitrators and that were created to support his damages analysis and to support the claim that the investment recommendations were unsuitable.[29] These documents cannot be unknown to Defendants. Furthermore, on February 8, 2011, Plaintiff provided a damages breakdown to Defendants[30] showing damages in the amount of $7,467,891

---

[26]  Campbell Exhibit 17.

[27]  April 13 Arb. Tr. at 157-224.

[28]  It is not clear if this last number includes payments on the loan and other margin obligations incurred on the recommendation of the UBS broker, Ruckno. If it does, Plaintiff contends they were improper charges because she was misled into incurring such debts in derogation of her investment objectives. Excluding the loan payments, Mrs. Boardman's "personal expenses withdrawn" over the life of the account amount to less than $l.5 million. Campbell Exhibit 17 at FINRA 00817.

[29]  Kessler documents bearing production numbers 13906-13935 are annexed to the Campbell Affirmation as Exhibit 19. Plaintiff identified Mr. Kessler as a witness in the parties' Joint Rule 26(f) Report pursuant to Local Rule 26.3.

[30]  Letter from William M. Bowen to Andrew Countryman and David Overstreet dated February 8, 2011, annexed to the Campbell Affirmation as Exhibit 20.

based upon, *inter alia*, a reasonable rate of return for her assets had they been suitably invested between April 2001 and 2011(as required by FINRA rules and just and equitable principles of trade), a return of monies invested in real estate transactions improperly recommended by the Respondents, and her attorneys fees in this action if successful in recovering her other damages; and deducting her original margin balance, anticipated capital gains taxed if paid in 2001, her estimated personal expenses over the same ten-year period based on information given to UBS at the commencement of the relationship.[31]

Defendants' damages argument (that Plaintiff spent it all) essentially is based on the documents and arguments that the arbitration respondents would have presented had they been required to put on a defense to the arbitration claim, that is, if Defendants' malpractice had not resulted in dismissal for failure to present a *prima facie* claim for relief.  The self-serving deposition testimony from the UBS lawyer (Joseph Coates) as to his theory of the case regarding the outrageous fees charged by UBS for the numerous MMAP contracts ($2,179,448, Campbell Exhibit 17, p. 1) and the claim that she made money on her MMAP deals, and the respondent UBS financial advisor (David Ruckno) as to his innocence in the whole matter (Motion at p. 9), is neither probative as damages testimony nor relevant to the issue of unsuitability, the primary claim upon which the arbitration was based.[32]

---

[31]  This damages amount includes $134,558 for the award to UBS on its counterclaim in the arbitration.  However, this award was not confirmed within one year (*i.e.*, by May 30, 2011) as required for enforceability by the Federal Arbitration Act, 9 U.S.C. § 9 (2010).  Because that award is now uncollectable, $134,558 may be deducted from the amount set forth in Exhibit 20.

[32]  See Report of Plaintiff's expert, Stanley F. Meyerson, dated May 3, 2011 ("Meyerson Report"; Attachment 2 to the Motion) at p. 5 ("UBS's recommendation that she use the MMAP program was unsuitable in 2001 and the subsequent years"); transcript of deposition of Stanley F. Meyerson, dated June 21, 2011 ("Meyerson Tr."), at 90:23-25 ("suitability is determined on day one.  Suitability is determined on the recommendation.  Suitability has nothing to do with performance.").  All cited Meyerson deposition transcript pages are included in Campbell Exhibit 21 as 21D.  Of course, the same principle of suitability applies to all of the investments found to be unsuitable, which includes, at the very least, all four of the MMAP investments between 2001 and 2007, the re-purchase of 55,000 shares of Synovus

Footnote continued on following page

Documents in the record present evidence that if Plaintiff's arbitration claims had been successful she "would have received a substantial recovery for her alleged injury." (Anderson Report at 1) Defendants' evidence of Mrs. Boardman's "spending" and "withdrawals" is disputed by the very evidence generated by Defendants for the arbitration, which, presumably, is what Mr. Anderson relied upon in giving his opinion that a substantial award would have resulted upon success in the arbitration.

Defendants' other expert (F. Jack Herrmann) identifies the UBS brokerage statements and Mr. Kessler's expert report (presumably arbitration exhibit 1) as resources he considered in forming his opinions. (Report of F. Jack Herrmann dated June 2, 2011 ["Herrmann Report"], [33] at p. 4) However, he does not identify UBS statements other than the brokerage account statements while he ignored others (*e.g.*, the loan account statements from UBS Bank reflecting a $1.2 million margin loan secured by the brokerage accounts), and does not offer any explanation as to why his opinion as to spending and "withdrawals" differs markedly from Defendants' other expert witness, Craig Kessler. Another issue that arises is how, given that he limited his review of Plaintiff's account to the UBS statements and Mr. Kessler's expert report, he could conclude that "by the end of 2007 Ms. Boardman . . . had a net negative equity." (*Id.*, at p. 5) This conclusion is contradicted by the January and February 2009 account statements (Campbell Exhibits 18A and B), both of which show a net equity for the brokerage account of $5,190,000 at the end of 2007. (*Id.*)

On the question of whether Plaintiff could show that she was damaged by the actions of the arbitration respondents such that she would have been successful below, Plaintiff's expert Stanley

---

stock sold pursuant to the first MMAP contract, the $1.2 million dollar loan to purchase the 55,000 Synovus shares and secured by Plaintiff's entire portfolio, and any other investment recommendation (which ultimately included options trades on Plaintiff's behalf) that did not conform to her admitted investment objective of income and protection of principal. Meyerson Report at pp. 3, 5-9.

[33] The Herrmann Report is in the record as Attachment 9 to the Motion.

Meyerson, after reviewing the investments placed in issue in the arbitration, concludes that "[a]s a result of deviations from the applicable standard of care by UBS, Mrs. Boardman sustained damages, [that] would have been recoverable against UBS." (Meyerson Report at p. 9) Notably, the damages analysis is not based on any account performance, profit and loss report or allegation that the MMAP actually made her money.[34] (Motion at p. 9) Defendants perhaps forget that the unsuitability of the UBS recommendations was one of her "strongest and most important claims." (Anderson Report at p. 3) Mr. Meyerson's opinion is based almost exclusively on the unsuitability of recommendations made between 2001 and 2009 [35] because performance is not relevant to the issue of suitability: "Suitability is determined on day one. Suitability is determined on the recommendation. Suitability has nothing to do with performance." (Meyerson Tr. at 90:23-25) Accordingly, Mr. Kessler's damages analysis, to which he will testify as a matter of fact as the damages evidence he prepared for the arbitration, is based on the unsuitability of the recommendations, the outrageous UBS fees, and misleading statements, not on poor performance.

In short, there is ample evidence from which a jury could conclude that Plaintiff's "withdrawals" for personal spending did not cause the damages sought in the arbitration, that UBS's investment recommendations were unsuitable, and that excessive UBS fees, interest and other

---

[34]   A wholly irrelevant fact, even if true, because it is based on the alternative of retaining the concentrated position in Synovus stock. Mrs. Boardman never should have continued to own the Synovus stock in 2001 or later. Mr. Meyerson's opinion is that the only suitable recommendation in 2001 was to sell the stock and invest the after tax proceeds to achieve her objectives of income and preservation of capital. (Meyerson Report at pp. 4-5) Defendants' expert (Mr. Herrmann) testifies that every recommendation was suitable, but without addressing Plaintiff's knowledge, experience, understanding, investment objectives and risk tolerance. (Herrmann Report at pp. 7, 9)

[35]   Mr. Meyerson does testify that the UBS statements were misleading and that even the UBS supervisors were misled as to her assets and could not understand the activity in the account. (Meyerson Report at p. 9) Proof that the statements were misleading may be evidence of fraud or misrepresentation claims; however, the resulting damage to Mrs. Boardman would be the same, not counting the possibility of a punitive award, and Mr. Kessler's spreadsheets and testimony (which show the discrepancies in the statements) would still apply. Although Mr. Herrmann testifies that the statements met industry standards, this is not determinative of, the claim that they were misleading.

charges, along with the misleading UBS statements, caused her damages and summary judgment should be denied.

II.

## JUDGMENTAL IMMUNITY IS NOT AVAILABLE FOR AN ATTORNEY'S NEGLIGENT JUDGMENTS

Defendants failed to inform themselves as to the facts, the law, the rules of the forum or any other aspect of this case; therefore, they are not protected from liability for any of their judgments. This issue has been fully briefed before in connection with Defendants' motion to dismiss the complaint dated August 25, 2010. The Court should reject this "judgmental immunity" argument now for the same reasons it was denied then.

In summary, this is not a case of unsettled or debatable law, or of good faith errors made by an informed and experienced attorney whose judgments were based on the proper degree of knowledge and skill ordinarily possessed by others of his profession similarly situated. Judgmental immunity simply does not apply when the attorney has performed services negligently. The doctrine does not protect attorneys from legal accountability for the harm caused by their negligence. Instead, "a distinction must be drawn between an attorney's ignorance, inattention, inaction or incompetence and an . . . honest error of judgment" (*Cianbro Corp. v. Jeffcoat and Martin*, 804 F.Supp. 784, 793 (1992)), because, "when an attorney's negligence or dereliction of duty prejudices a client's rights or position, the attorney must be held accountable for his or her conduct." *Id.* at 789.

In any event, Defendants have admitted that there are genuine issues of fact on the issue of breach of the standard of care (Motion at pp. 5-6); therefore, whether Defendants' alleged breaches of the standard of care were negligence or reasonable tactical decisions protected by judgmental immunity (if the defense is even available in South Carolina) is a question of fact for the jury and

33

cannot be resolved on summary judgment. *See Pulliam Investment Co., Inc. v. Cameo Properties, supra*, 810 F.2d 1282, 1286 (4th Cir. 1987).

## **CONCLUSION**

For reasons stated above, Plaintiff respectfully asks that this Court deny each and every element of Defendants' Motion for summary judgment.

September 26, 2011
Hilton Head Island, South Carolina

Respectfully submitted,


   /s/ William M. Bowen
By: William M. Bowen
WILLIAM M. BOWEN, P.A.
Attorney for Plaintiff
P.O. Drawer 6128
Hilton Head, SC 29938
843-842-5000
F: 843-686-5990